## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | | |
|---|---|---|
| In re: | * | |
| | | |
| **ELITE SCHOOL BUS COMPANY, LLC** | * | **Case No. 25-11526 DER** |
| Debtor | * | **Chapter 11 (Subchapter V)** |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

| | | |
|---|---|---|
| **ELITE SCHOOL BUS COMPANY, LLC, Plaintiff** | * | **Adversary Case No. _____** |
| | * | |
| **v.** | * | |
| | * | |
| **ALTERNATIVE CAPITAL GROUP LLC, Defendant** | * | |
| | * | |
| SERVE ON | | |
| New York Registered Agent LLC | * | |
| 418 Broadway Ste Y | | |
| Albany, NY   12207 | * | |
| | | |
| Resident Agent | * | |
| | | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### COMPLAINT I) FOR DECLARATORY JUDGMENT; II) TO FIND AGREEMENTS VOID AB INITIO; III) TO DETERMINE EXTENT, VALIDITY AND PRIORITY OF LIENS OR PURCHASE OF RECEIVABLES; IV) AVOID PREFERENTIAL TRANSFERS; V) AVOID FRAUDULENT TRANSFERS; (VI) RECOVER VALUE; (VII) ORDER THE TURNOVER OF FUNDS TO THE ESTATE; AND (VIII) TO DISALLOW CLAIM AND OBJECTION TO CLAIM

Elite School Bus Company, LLC, Debtor and Debtor-in-Possession (the "**Debtor**"), by and

through undersigned counsel, hereby file this Complaint: I) For Declaratory Judgment; II) to Find

Agreements Void Ab Initio; III) To Determine Extent, Validity and Priority of Liens or Purchase

of Receivables; IV) Avoid Preferential Transfers; V) Avoid Fraudulent Transfers; VI) Recover

6306162.2

1

Valu;,  (VII) Order the Turnover of Funds to the Estate, and VIII) to Disallow Claim and Objection to Claim (the "**Complaint**") pursuant to 11 U.S.C. Sections §§ 105, 502, 506, 542, 544, 548,  550, and MD [Com. Law] Code Ann §§ 15-201, et seq., and Bankruptcy Rule 7001(2) and alleges as follows:

**NOTICE IS HEREBY GIVEN TO CLAIMANT REGARDING THE OBJECTION TO CLAIM AND PURSUANT TO MARYLAND LOCAL BANKRUPTCY RULE 3007-1:**
**(a) Within thirty (30) days after the date on the certificate of service of the objection, the claimant may file and serve a response, together with any documents and other evidence the claimant wishes to attach in support of its claim, unless the claimant wishes to rely solely upon the proof of claim;**
**(b) an interested party may request a hearing that will be held at the court's discretion; and**
**(c) The Court may overrule the objection or set a hearing on the objection if the objection fails to include adequate support for the requested relief, even if a response is not filed.**

1.      On February 25, 2025 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor elected to proceed under Subchapter V of Chapter 11 of the Bankruptcy Code ("**Subchapter V**").

## I.      CONSENT TO FINAL ORDERS

2.      Pursuant to Local Bankruptcy Rule 7012-1(b), the Debtor consents to entry of final orders or judgments by the Judges of the United States Bankruptcy Court for the District of Maryland (the "**Court**").

## II.      JURISDICTION AND VENUE

3.      This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 157 and 1334.  The claims set forth herein are core proceedings pursuant to 28 U.S.C. § 157(b).

4.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicates for this Complaint are 11 U.S.C. §§ 105, 502, 506, 542, 544, 548, 550, and MD [Com. Law] Code Ann §§ 15-201, et seq.

### III.    PARTIES

6.      Plaintiff, the Debtor, is the debtor in possession in the above-captioned bankruptcy case and a Maryland limited liability company operating at 511 Conowingo Road, Conowingo, Maryland 21918.

7.      Upon information and belief, the defendant, Alternative Capital Group  LLC ("**ACG**"), is a Delaware Limited Liability Company doing business at 61 Broadway #1901, New York, NY 10006.

### IV.    FACTS

### A.    U.S. Small Business Administration Loans

8.      The Debtor was founded in 2015 and operates a school bus company that provides transportation services primarily to Cecil County public schools.  Each school day, the Debtor transports thousands of children to and from school.

9.      On or about June 10, 2020, the Debtor obtained a COVID Economic Injury Disaster loan from the United States Small Business Administration (the "**SBA**") in the original principal amount of $41,600.00 (the "**Note**"). The Debtor executed a security agreement granting the SBA a lien on all the Debtor's then owned or thereafter acquired tangible and intangible property including:

> All tangible and intangible personal property, including, but not limited to: (a) inventory, (b) equipment, (c) instruments, including promissory notes (d) chattel paper, including tangible chattel paper and electronic chapter paper, (e) documents, (f) letter of credit rights, (g) accounts, including health-care insurance receivables and credit card receivables, (h) deposit accounts, (i) commercial tort claims, (j) general intangibles, including payment intangibles and software and (k) as-extracted collateral as such terms may from time to time be defined in the Unifor Commercial Code.  The security interest Borrower grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof …

(collectively, the "**Collateral**") to secure the Note indebtedness. On or about June 29, 2020, the SBA filed a UCC-1 Financing Statement perfecting its lien.  Upon information and belief, the only Debtor assets to which the SBA's lien did not attach are the Debtor's bank accounts, buses, and other vehicles.

10.     On February 3, 2022, the Note was amended to increase the principal indebtedness to $151,500.00.  On or about April 27, 2022, the Note was amended again to increase the principal indebtedness to $500,000.00 as evidenced by a Second Modification of Note (the "**Modified Note**").  Pursuant to the Modified Note, the outstanding principal indebtedness accrued interest at the rate of 3.750% and the Debtor was required to make monthly payments of $2,481.00 until the Modified Note matured on June 16, 2050.  The Modified Note indebtedness was secured by the Collateral as evidenced by an Amended Security Agreement. The SBA loan documents, as amended and modified, are collectively referred to as the "**SBA Loan Documents**" and the SBA loans are collectively referred to as the "**SBA Loan**."

11.     On April 3, 2025, the SBA filed a Proof of Claim (Claim No 7) asserting that as of the Petition Date, the total amount owed by the Debtor under the SBA Loan was $468,081.64.

### B.      Junior Lienholders Loans

### i.      FC Marketplace LLC

12.     On information and belief, on May 19, 2022, FC Marketplace LLC ("**FCM**") provided a loan to the Debtor in the principal amount of $412,500.00 as evidenced by a Business Loan and Security Agreement together with Common Governing Provisions which are incorporated into the Business Loan and Security Agreement (collectively, the "**FCM Loan Documents**").  The FCM Loan Documents provide that in exchange for the loan, the Debtor granted FCM a security interest in its accounts receivable and other personal property.

6306162.2

13.     FCM filed a Proof of Claim in the Debtor's bankruptcy case on March 20, 2025, (Claim No 3) and attaches to its Proof of Claim a UCC-1 which reflects that it was filed with the Maryland State Department of Assessments and Taxation.  FCM asserts that as of the Petition Date, it was owed $229,974.04 by the Debtor and that it holds a fully secured claim in the amount of $229,974.04.

14.     At the time that FCM provided its loan to the Debtor, the Debtor's accounts receivable and other personal property (except upon information and belief, the Debtor's bank account and vehicles) were already subject to the senior fully perfected lien held by the SBA.

### ii.     ODK Capital, LLC

15.     Upon information and belief, on or about January 22, 2024, ODK Capital, LLC ("**ODK**") provided a loan to the Debtor in the principal amount of $180,000.00 as evidenced by a Business Loan and Security Agreement and Business Loan and Security Agreement Supplement (collectively, the "**ODK Loan Documents**").  The ODK Loan Documents provide that in exchange for the loan, the Debtor granted ODK a security interest in certain then owned or thereafter acquired tangible and intangible personal property including the Debtor's accounts receivable.

16.     ODK filed a Proof of Claim in the Debtor's bankruptcy case on March 25, 2025, (Claim No 4) and attaches to its Proof of Claim a UCC-1 that was filed with the Maryland State Department of Assessments and Taxation.  ODK asserts that as of the Petition Date, it was owed $12,596.55 by the Debtor and that it holds a fully secured claim in the amount of $12,596.55.

17.     At the time that ODK provided its loan to the Debtor, the Debtor's accounts receivable and other personal property (except upon information and belief, the Debtor's bank accounts and vehicles) were already subject to the senior fully perfected lien held by the SBA.

iii.     **ACG**

18.     On information and belief, on August 7, 2024, ACG provided the Debtor $60,000.00 as provided in a Revenue Purchase Agreement (the "**ACG Agreement**"). The ACG Agreement provides that in exchange for that payment, the Debtor sold to ACG an 11% share of all future receivables until ACG was paid $87,600.00.  Upon information and belief, the asserted purchase of receivables is also governed by i) a Merchant Agreement Terms and Conditions (the "**ACG Merchant Agreemen**t") and ii) a Security Agreement and Guaranty of Performance ("**Security Agreement**") and iii) a Prepayment Discount Addendum (the "**Prepayment Addendum**"). The ACG Agreement, ACG Merchant Agreement, Security Agreement and Prepayment Addendum are collectively referred to as the "**ACG Documents**".  The ACG Documents provide that they are governed by New York law.

19.     The Security Agreement provides:

[t]his Agreement will constitute a security agreement under the Uniform Commercial Code. To secure Merchant's obligations under the Revenue Purchase Agreement to make available or deliver Purchased Amount to FUNDER and FUNDER's right to realize the Purchased Amount, as and to the extent required by the terms of the Revenue Purchase Agreement, and performance of and compliance by Merchant with its other undertakings and agreements herein, Merchant and Guarantor(s)(s) grants to FUNDER a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s)(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s)(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to FUNDER under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets").  Merchant agrees to provide other security to FUNDER upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover FUNDER's entitlements under this Agreement, FUNDER is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets.  These security interests and liens will ssecure all of Funder's entitlements under this Agreement…"

20.     The Security Agreement also provides that to the extent that the Debtor's owners create a new business, then that new entity will be deemed to have assumed the obligations of the Debtor under the ACG Documents and ACG may collect any funds owed by such entity's account debtors to such entity.

21.     The Security Agreement provides that ACG may exercise its rights under the Security without notice and that ACG may collect any funds owed by the Debtor's account debtors to the Debtor pursuant to Article 9 of the Uniform Commercial Code ("**UCC**") and that it has all rights under the UCC with respect to all of its security interests and liens.  In addition, the Security Agreement requires that the Debtor execute any documents that ACG requires in order to perfect and confirm its lien and security interest.  None of ACG's  rights and remedies under the Security Agreement are triggered by an event of default and rather they exist even in the absence of any event of default.  Lastly, the Security Agreement includes cross collateralization provisions with the guarantors' assets and prohibits the Debtor from having any lien on its collateral.

22.     Pursuant to the Prepayment Addenum, to the extent that the Debtor prepays the debt owed under the ACG Documents, then the debt is reduced by specific amounts.

23.     At the time of the execution of the ACG Documents, ACG had either constructive notice or upon information and belief, actual notice and knowledge of the previously filed UCC-1s by the SBA and other secured creditors.

24.     Upon information and belief, on February 3, 2025 (within 90 days of the Petition Date), ACG, by and through its alleged servicer, SuperFast Capital ("**Superfast**"), filed a UCC-1 asserting a perfected interest in the Debtor's accounts receivable.  The UCC-1 provides that Superfast is the "Secured Party" and that its collaters includes: "[p]ursuant to the Revenue

6306162.2

Purchase Agreement, all of the Debtor's tangible and intangible assets, whether now existing or hereinafter arising or acquired and wherever located and all proceeds of such assets (collectively, the "Collateral")". Significantly, the box marked "ALTERNATIVE DESIGNATION (if applicable) Seller/Buyer was not checked by Superfast.

25. On April 23, 2025, ACG filed a Proof of Claim (Claim No. 14) asserting that as of the Petition Date, ACG held a secured claim against the Debtor in the amount of $44,818.01 and that the debt accrued interest at a "fixed" rate of "0.00%". In response to Question 9 as to whether all or part of the claim is secured, ACG answers "Yes. The claim is secured by a lien on property." In response to the question on the nature of the collateral, ACG responds "all assets" and that the basis for perfection of its lien is a UCC-1. ACG attaches no documents to support its Proof of Claim.

C.    **Transfers to ACG Prior to the Petition Date**

26. The ACG Agreement provided that ACG was entitled to 11% of the future receivables received by the Debtor until ACG received a total sum of $87,600.00.

27. After the execution of the ACG Agreement and up until the Petition Date, the Debtor paid to ACG at a minimum the following on or about the following dates:

| | |
|---|---|
| 08/14/24 | $2,037.21 |
| 08/20/24 | $2,037.21 |
| 08/28/24 | $2,037.21 |
| 09/04/24 | $2,037.21 |
| 09/11/24 | $2,037.21 |
| 09/18/24 | $2,037.21 |
| 09/25/24 | $2,037.21 |
| 10/02/24 | $2,037.21 |
| 10/09/24 | $2,037.21 |
| 10/16/24 | $2,037.21 |
| 10/23/24 | $2,037.21 |
| 11/01/24 | $2,037.21 |
| 11/06/24 | $2,037.21 |
| 11/13/24 | $2,037.21 |
| 11/20/24 | $2,037.21 |
| 11/27/24 | $1,018.75 |

| | |
|---|---|
| 12/04/24 | $1,018.75 |
| 12/11/24 | $1,018.75 |
| 12/18/24 | $1,018.75 |
| 12/26/24 | $2,037.21 |
| 01/02/25 | $2,037.21 |
| 01/08/25 | $2,037.21 |
| 01/15/25 | $2,037.21 |

**TOTAL  $42,781.99**

(collectively, the "**Payments**").

28.    Of the total Payments paid to ACG by the Debtor after the execution of the ACG Agreement, the following specified payments were paid by the Debtor to ACG in the 90 days prior to the Petition Date:

| | |
|---|---|
| 11/27/24 | $1,018.75 |
| 12/04/24 | $1,018.75 |
| 12/11/24 | $1,018.75 |
| 12/18/24 | $1,018.75 |
| 12/26/24 | $2,037.21 |
| 01/02/25 | $2,037.21 |
| 01/08/25 | $2,037.21 |
| 01/15/25 | $2,037.21 |

**TOTAL    $12,223.84**

(collectively, the "**Preferential Transfers**").

**D.    The Lienholder's Positions as of the Voluntary Petition and the Debtor's Assets**

29.    As of the Petition Date, the total amount owed by the Debtor to the SBA under the SBA Loan was $468,081.64.

30.    As stated above, FCM filed a Proof of Claim asserting that as of the Petition Date, it was owed $229,974.04 by the Debtor.

31.    As stated above, ODK filed a Proof of Claim asserting that as of the Petition Date, it was owed $12,596.55 by the Debtor.

32.    On February 25, 2025, the Debtor filed its Schedules detailing all of its assets and

their respective values.  Thereafter, on April 10, 2025, the Debtor amended its Schedules.  The original Schedules and amended Schedules are collectively referred to as of the **"Schedules"**.  As of the Petition Date, the Debtor's assets and values of such assets, as evidenced by the Schedules, that were subject to the SBA's lien consisted of the following:

|    |    |    |
|----|----|----|
| a. | Tools | $12,000.00 |
| b. | Office Equipment | $2,500.00 |
| c. | Bus Replacement Items | $7,000.00 |
| d. | Accounts Receivable | $86,913.00 |
|    | **TOTAL** | **$108,413.00** |

(collectively, the "**Assets**")

33.     Based on the SBA's Loan Documents and UCC-1, the SBA has a first priority lien on the Assets which lien was fully perfected and takes priority over any subsequent lienholder including FCM, ODK and any subsequent purchaser of accounts receivable such as ACG.

34.     Based upon the value of the SBA's collateral and the amount that it is owed, the SBA, the first lien holder with priority, is substantially under secured.

35.     In light of the amount owed to the SBA and the value of the Assets collateralizing the SBA Loan, there is simply no equity in the Debtor's Assets to which any subsequent lien including any lien held by ACG (to the extent that the ACG transaction gave rise to a loan), if it had been properly perfected, could attach and thus ACG's claim against the Debtor is fully unsecured.

### E.     The Debtor's Other Creditors and Assets

36.     As of the Petition Date, the Debtor owed First National Bank of Pennsylvania (the "**Bank**") a total amount of $781,394.47 as evidenced by various loans and the Bank's Amended

6306162.2

Proof of Claim filed in the instant case on May 21, 2025.  The Bank's collateral consisted of numerous buses owned by the Debtor which served to cross collateralize all of the Bank's loans. As of the filing of the Voluntary Petition, and based upon an appraisal by the Bank, the Bank held a secured claim against the Debtor in the amount of $781,394.47 as evidenced by the Bank's Amended Proof of Claim and an appraisal of the buses that constitute the Bank's collateral. Accordingly, there is no equity in these buses.

37.     As of the Petition Date, the Debtor owes Joseph and Edwina Gilbert (the "**Gilberts**") a total amount of $529,788.07 which debt was secured by various buses as evidenced by a promissory Note and Security Agreement dated July 1, 2019.  The Gilberts averred that the value of these buses is $80,000.00.  As a result, there is no equity in these buses.

38.     As of the Petition Date, the Debtor owes Ford Motor Credit Company ("**Ford**") a total amount of $24,789.23 pursuant to a Maryland Vehicle Retail Installment Contract which debt is secured by a vehicle with an approximate value of $30,000.00.  Upon information and belief, any equity in this vehicle is de minimus and would be used to pay costs of sale such that no funds would be remaining after the sale for payment to the Debtor's other creditors.

39.     From the date of the Payments and through the Petition Date, the total amount owed by the Debtor on account of asserted secured claims was at least approximately $2,194,063.73; the value of such secured creditors' collateral, however, was at most, approximately $999,807.47 and thus, these creditors had unsecured claims totaling approximately $1,194,256.26.  From the date of the Payments and through the Petition Date, the total amount of the unsecured claims, including the unsecured claims held by the secured creditors, was no less than approximately $1,589,103.93.

40.     As of the Petition Date, the Debtor's only unencumbered assets that would be

available to be liquidated to pay unsecured claims consisted of i) a bank account of $6,100.00, ii) a 2018 Ford Truck with equity of approximately $18,000.00, and iii) certain older buses which had a value of between $9,200.00 and $39,000.00 (collectively, the "**Unencumbered Assets**"). The total value of these Unencumbered Assets was no more than $63,100.00.  At no time did ACG have a perfected lien on these Unencumbered Assets.

41.     Even if ACG later asserts that any lien it held attached to the Unencumbered Assets, upon information and belief, it failed to obtain such lien and perfect it pursuant to applicable Maryland law.  At no time did: i) ACG and the Debtor execute a collateral account agreement granting ACG a security interest and lien on the Debtor's bank accounts; and ii) ACG receive a security interest in the Debtor's vehicles and/or file papers with the Maryland Department of Motor Vehicles to evidence a lien on such vehicles.

### F.     Insolvency

42.     At the time of (i) the filing of ACG's UCC-1 and its alleged perfection of any security interest in and lien on the Debtor's accounts receivable or if the underlying transaction is a true purchase of future receivables, the alleged perfection of its purchase rights to the Debtor's accounts receivable; and (ii) the payment of the Payments and the Preferential Transfers, the Debtor was insolvent and remained insolvent through the Petition Date.

43.     At the time of  (i) the filing of ACG's UCC-1 and any alleged perfection of its security interest in and lien on  Debtor's accounts receivable or if the underlying transaction is a true purchase of future receivables, the alleged perfection of its purchase rights to the Debtor's accounts receivable; and (ii) the payment of the Payments and the Preferential Transfers, under both a balance sheet analysis and fair market value analysis, the value of the Debtor's assets were far less than the total of its liabilities and the Debtor lacked the necessary assets to pay its debts.

44.     At the time of (i) the filing of ACG's UCC-1 and any alleged perfection of any

6306162.2

security interest in and lien on Debtor's accounts receivable or if the underlying transaction is a true purchase of future receivables, the alleged perfection of its purchase rights to the Debtor's accounts receivable; and (ii) the payment of the Payments and the Preferential Transfers, the Debtor owed substantial funds to creditors on an unsecured basis.

45.     As of the date of the (i) filing of ACG's UCC-1 and any alleged perfection of its security interest in and lien on the Debtor's accounts receivable or if the underlying transaction is a true purchase of future receivables, the alleged perfection of its purchase rights to the Debtor's accounts receivable; and (ii) the payment of the Payments and the Preferential Transfers,  the Debtor's Assets were fully encumbered and its $63,100.00[1] in Unencumbered Assets were insufficient to pay its $1,589,103.93 in unsecured debt.

46.     As of the date of the (i) the filing of ACG's UCC-1 and any alleged perfection of its security interest in and lien on Debtor's accounts receivable or if the underlying transaction is a true purchase of future receivables, the alleged perfection of its purchase rights to the Debtor's accounts receivable; and (ii) the payment of the Payments and the Preferential Transfers, the Debtor was insolvent in that under both a balance sheet analysis and fair market value analysis, the value of the Debtor's assets was less than amount required to pay its probable liability on its existing debts as they become absolute and matured.

47.     As of the date of the (i) filing of ACG's UCC-1 and any alleged perfection of its security interest in and lien on Debtor's accounts receivable or if the underlying transaction is a true purchase of future receivables, the alleged perfection of its purchase rights to the Debtor's accounts receivable; and (ii) the payment of the Payments and the Preferential Transfers, the Debtor was insolvent in that the sum of the Debtor's debts was greater than all of the Debtor's

---

[1] The Unencumbered Assets have a value of no greater than this amount.

property at a fair valuation exclusive of property transferred, concealed or removed with intent to hinder, delay or defraud the Debtor's creditors.

## COUNT ONE

### (Declaratory Judgment that Advance of Funds Constituted a Loan and Not a Purchase of Receivables)

48.     The Debtor incorporates herein the allegations made in paragraphs 1 through 47 of this Complaint.

49.     The ACG Documents gave rise to a loan from ACG to the Debtor which was disguised as a sale of receivables or receipts to ACG.  In exchange for the loan, the Debtor paid ACG interest and gave it a security interest in its accounts receivable and other personal property.

50.     Regardless of the titles of the ACG Documents, the practices, objectives, relationship, and intention of the parties determine the true nature and meaning of the documents. Numerous facts evidence that the underlying transaction was, in fact, a loan including but not limited to the following:

51.     One of the primary indicators of whether a transaction is a loan or sale of receivables is the allocation of risk between the borrower/seller and lender/purchaser.  Any true sale of accounts receivable causes the "purchaser" of the accounts receivable to assume the risk of loss in that if the receivables are not collectible, the purchaser does not get paid and has no recourse to the seller.  In contrast, a loan disguised as a sale of accounts receivable causes the seller/borrower to assume the risk of loss in that if the accounts receivable are not collected, the purchaser/lender still must be repaid by the seller/borrower and the purchaser/lender still has recourse against the seller/borrower.  Accordingly, if the purchaser/lender holds substantial recourse against the seller/borrower, it signifies that the transaction is a loan and not a purchase of receivables.  By disguising a loan as a sale of accounts receivable, the purchaser/lender can charge

the seller/borrower exorbitant interest rates on the amount "loaned/funder" which is otherwise prohibited under usury laws that are applicable only to loans.

52.     The ACG transaction bears the hallmarks of a loan as there was no actual transfer of risk of loss from the Debtor, as seller, to ACG, as purchaser. The ACG Agreement provides upon the occurrence of an event of default, the purchased percentage immediately increases from 11% to shall equal 100%.   This provision clearly provides ACG with a full right of recourse against the Debtor for nonpayment and is a factor in favor of deeming the transaction a loan.

53.     The Security Agreement is highly indicative that the transaction is a loan. It makes explicitly clear that the Debtor is giving ACG a security interest in and lien on various assets including equipment and inventory --- not just accounts receivable.  By granting ACG a lien on the Debtor's receivables and personal property, the Debtor has provided ACG with additional recourse, severely limiting the chance of non-payment, again demonstrating that the transaction is a loan.  Further, if the transaction was truly a sale of the Debtor's future receivables, then there would be no need for a security agreement and the granting of a security interest in the Debtor's receivables and other personal property.  Lastly, any true purchase of receivables does not give the lender/purchaser a lien on the Debtor's other assets such as here where ACG received a lien on the equipment and inventory.

54.     The Security Agreement also provides ACG the right to demand additional collateral to further secure the debt.  This is yet another hallmark that the transaction is a loan and evidences that the allocation of risk on nonpayment is on the Debtor and not on ACG.

55.     To the extent the Debtor's owners start a new company, the Security Agreement automatically deems such new company to have assumed the ACG debt obligations and gives ACG a lien on such new company's assets.  Again, the allocation of risk is on the Debtor and not

ACG.  Further, if this was a true sale of receivables, ACG would never have the right to collect against third parties; it would be limited to collecting the Debtor's receivables.

56.    The Security Agreement provides that the debt is cross collateralized --- yet no true sale of receivables includes cross collateralization provisions.    The Prepayment Addendum permits the Debtor to prepay the debt and if it does, then the debt is discounted.  This is exactly like any prepayment of a loan---if the borrower prepays a loan, then the debt is decreased to exclude interest that would otherwise accrue but for the early payment. These are all signs of a loan.

57.    The ACG UCC-1 provides that Superfast, ACG's servicer, is the "Secured Party" and that its collateral is all of the Debtor's tangible and intangible assets ---all evidence that this is far different than any purchase of the Debtor's receivables.   In addition, the box on the UCC-1 to show that Superfast, as agent, is the "purchaser" of receivables was never checked.  Lastly, ACG's own Proof of Claim indicates that its debt is secured by a lien on the Debtor's property and in particular "all assets" and that the UCC-1 is the basis for perfection of its lien. Again, these are all signs of a loan.

58.    The Debtor's accounts receivable were subject to prior perfected security interests of the SBA and others. As a result, the Debtor could not sell any receivables to ACG since they were already the collateral of the SBA and others.  The Debtor cannot sell that which it does not have clear title.  Upon information and belief, ACG was already aware of these earlier perfected security interests yet still provided the funding to the Debtor.  If this was a true purchase of receivables, ACG would never have provided the funding because it would have known that the Debtor could not transfer good title to its receivables to ACG when they were already subject to senior liens of the Debtor's secured creditors.

WHEREFORE, the Debtor respectfully requests that this Court:

   i.  declares that the underlying transaction under the ACG Documents is a loan and not a purchase of future receivables; and

   ii.  grant the Debtor any such other relief that is just and proper.

## COUNT TWO

### ACG Documents Charge A Criminally Usurious Interest Rate and The Transaction is Void Ab Inito [If Court Finds Transaction is a Loan]

59.  The Debtor incorporates herein the allegations made in paragraphs 1 through 58 of this Complaint.

60.  Once this Court finds that the ACG transaction was a loan and not a sale of receivables, the Court must then determine whether the ACG Documents violate New York's Criminal Usury Law.

61.  New York's criminal usury statute provides that: "[a] person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period." N.Y. Penal Law § 190.40 (McKinney).

62.  To find criminal usury under New York law, the Court in AKF, *Inc, supra*, stated that:

> "a debtor must allege and prove by clear and convincing evidence that [(1)] a loan or forbearance of money, [(2)] requiring interest in violation of [the criminal] usury statute, [(3)] was charged by the lender or payee with the intent to take interest in excess of the legal rate [of 25% per annum].' *Blue Wolf Cap Fund II, L.P. v. Am. Stevedoring Inc.*, 105 A.D.3d 178, 961 N.Y.S.2d 86, 89 (2013) (citations omitted); N.Y. Penal Law § 190.40 (McKinney 2022) (making it unlawful to charge interest on a loan "at a rate exceeding twenty-five per centum per annum[.]"). "Under [New York law], the defense of [civil] usury [(i.e., interest over 16%)] is not available to corporations, but this bar does not preclude a corporate borrower from raising the defense of "criminal usury" (i.e., interest over 25%) in a civil action[.]" *See Adar Bays, LLC v. GeneSYS Id, Inc.*, 37 N.Y.3d 320,

157 N.Y.S.3d 800, 179 N.E.3d 612,616 (2021). On summary judgment, a debtor may meet its "burden of proof simply by submitting the [contract] evidencing the usurious transaction." *Funding Grp., Inc. v. Water Chef, Inc.*, 19 Misc.3d 483, 852 N.Y.S.2d 736, 740 (Sup. Ct. 2008)."

63.     The first element requires that the agreement be a loan or forbearance of money. That element has been met.

64.     The New York Criminal Usury Statute is applicable to commercial loans for less than $2.5 million. As can be seen from the ACG Documents, this loan was for a total of $60,000.00 and falls within the Statute.

65.     The second element requires that the interest charged is in excess of 25%. In calculating the effective interest rate, New York courts look to the procedure set forth in *Band Realty Company v. North Brewster, Inc*., 37 N.Y.2d 460 (1975):

> Pursuant to the *Band* formula, the "true" annual interest rate is determined by taking the "discount"—i.e., the difference between the amount advanced to the borrower and the amount owed to the lender—dividing that amount by the number of years in the term of the loan, adding that amount to the interest rate stated on the note, and dividing this sum by the difference between the principal and the discount (i.e., the net advance). *Canal*, 41 N.Y.S.3d at 829 ("In applying the [Band formula], the discount, divided by the number of years in the term of the [loan], should be added to the amount of interest due in one year, and this sum is compared to the difference between the principal and the discount in order to determine the true interest rate[.]" … ("Where, as here, the loan is for less than a year, the interest rate is annualized[.]); …

*AFK, Inc.,* 632 F.Supp.3d at 79.

66.     Applying the Band formula to the provisions of the ACG Documents, the effective annualized interest rate is a **whopping 67%**! This interest rate far exceeds the 25% interest rate allowed by New York and is patently usurious.

67.     The third and final element is to prove that the interest charged by the lender or payee is with the intent to take interest in excess of the legal rate of 25% per annum. The *AKF* Court provided a primer on New York law as it comes to what evidence will be sufficient to meet burden of the third element:

6306162.2

18

*10 The New York Court of Appeals has articulated two tests for identifying transactions so patently usurious such that usurious intent is imputed as a matter of law. The first is the 'usurious effect' test, focusing on the transaction's usurious consequences. *See Fiedler*, 50 N.Y. at 443 ("The effect of the transaction was to secure the plaintiff more than [the statutory maximum] for the loan. The agreement was vicious because of the usurious effect, by which the intent of the parties must be judged" (emphasis added)); *Seymour v. Strong*, 4 Hill 255 (N.Y. Sup. Ct. 1843) ("The [transaction has a] usurious effect, by which the intent of the parties must be judged[.]") (New York's highest court before 1846); *Hall v. Earnest*, 36 Barb. 585 (N.Y. Sup. Ct. 1861) ("The argument that there can be no usury ... when the party [executing] the paper is ignorant [of its character], and is in fact [told by others that the paper is legal], is not sound if the legal effect of the transaction involves a usurious agreement[.]"). The second, stemming from the Freitas decision, is the 'usurious on its face' test which asks whether the usury, usually the interest rate itself, "appear[s] on the face of the note[.]" See 63 N.Y.2d 254, 481 N.Y.S.2d 665, 471 N.E.2d at 443 (finding that usurious intent could not be imputed to a mortgagee charging more than the lawful sum of interest, because the contract stated only a lawful amount of interest and the mortgagee inadvertently labelled and charged inspection services as fees and thereby elevated the interest amount); Greenfield v. Skydell, 186 A.D.2d 391, 588 N.Y.S.2d 185, 185 (1992) ("[I]n this case, no stated rate of interest appears upon the face of the note[;] ... [thus t]o establish usury, facts extrinsic to the document must be referred to."); AJW Partners, LLC v. Cyberlux Corp, 21 Misc.3d 1109A, 873 N.Y.S.2d 231 (Sup. Ct. 2008) (same). "[B]ecause a usurer usually seeks to conceal the usury, and to accomplish the purpose by indirect methods, questions of usurious intent ... are typically questions of fact[.] Adar Bays, 157 N.Y.S.3d 800, 37 N.Y.3d 320, 179 N.E.3d at 625. AKF, Inc., 632 F.Supp.3d at 81.

68.    The AKF Court found, much like the case before this Court:

"… it is the RPA's language itself that spells usury. From the four corners of the contract, the Court gleans a loan at an interest rate five times the statutory limit, ostensibly backed by collateral. … the transfer of $93,614 in return for $130,545 paid under demanding conditions, including an implicit term of slightly over six months— "was merely a way of expressing" a loan at a grossly usurious rate. Thus, the Court imputes usurious intent as a matter of law.

Id at 82.

69.    Intent can be shown by one of two ways. The first test is the "usurious effect" test, which focuses on the transaction's usurious consequence; See Fiedler, 50 N.Y. at 443 ("The effect of the transaction was to secure the plaintiff more than [the statutory maximum] for the loan. The agreement was vicious because of the usurious effect, by which the intent of the parties must be judged"). Here, ACG disguised the transaction as a sale, attempting to bypass the New York Criminal Usury Statute while the true intent was to make a loan at a usurious rate. It further tried

6306162.2

19

to conceal its exorbitant interest rate by specifying in it Proof of Claim that while the interest rate was fixed, it had a rate of 0%.

70.     The second test is the "usurious on its face" test. This test is satisfied if the usurious rate can be calculated from the four corners of the respective agreement. In this case, this Court can conclude that effective interest rate under the ACG Documents far exceeded the statutory rate. Under the terms of the ACG Documents, the transfer from ACG to the Debtor of $60,000.00 in return for $87,600.00 paid by Debtor to ACG, including an implicit term of slightly under 43 weeks, resulted in an effective interest rate of 56% or an annualized interest rate of 67%. Like the finding by the AKF Court, the ACG Documents were "merely a way of expressing" a loan at a grossly usurious rate. Like the AFK Court, this Court should impute usurious intent as a matter of law.

71.     Once this court finds that a contract violated the criminal usury statute, the contract is *void ab initio*. In 2021, the Court of Appeals of New York held "… loans proven to violate the criminal usury statute are subject to the same consequence as any other usurious loans: complete invalidity of the loan instrument." *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 179 N.E.3d 612, 157 N.Y.S.3d 800, 809 (N.Y.App. 2021).

72.     To the extent that the ACG Documents are void ab initio, then ACG holds all the $42,781.99 in Payments, or the value of such Payments, in trust for the Estate.

WHEREFORE, Plaintiff respectfully requests that this Court:

    i.      Find the ACG Documents to have violated New York's Criminal Usury Statute and are void ab initio;

    ii.     Find that ACG was not and is not entitled to payment of principal or interest;

    iii.    Find that any liens held by ACG are void;

    iv.     Disallow ACG's Proof of Claim in full; and

v.    Find that all the Payments made to ACG or the $42,781.99 value of such Payments are held in trust for the Estate subject to turnover.

## COUNT THREE

### Recording of UCC-1 is a Preference – 11 U.S.C. §547
### [If the Transaction is a Loan or Purchase of Accounts Receivable and is Enforceable]

73.    The Debtor incorporates herein the allegations made in paragraphs 1 through 72 of this Complaint.

74.    Pursuant to Section 547(b) of the Bankruptcy Code, a transfer of an interest of the Debtor in property may be avoided if the transfer was (a) to or for the benefit of a creditor, (b) for or on account of an antecedent debt owed by the Debtor before such transfer was made, (c) made while the Debtor was insolvent, (d) made on or within 90 days of the Petition Date, and (e) that enables such creditor to receive  more in satisfaction of its claim than it would receive in a case under Chapter 7 of the Bankruptcy Code and if the transfer had not been made.

75.    To the extent that ACG's underling transaction is a loan, then ACG's filing of its UCC-1 on February 3, 2025 and the alleged perfection of its security interest in and lien on Debtor's accounts receivable and other assets (collectively, the "**UCC Transfer**") constitutes a transfer of an interest of the Debtor in property to or for the benefit of the ACG, a creditor of the Debtor.  Alternatively, if the underlying transaction is not a loan and is instead a purchase of receivables, then upon information and belief the filing of its UCC-1 perfected ACG's ownership interest in the receivables (collectively, the "**Sale Transfer**").

76.    The UCC Transfer or the Sale Transfer was made for or on account of an antecedent debt owed by the Debtor to ACG before the UCC Transfer or Sale Transfer was made.

77.    The UCC Transfer or the Sale Transfer was made while the Debtor was insolvent.

78.    The UCC Transfer or the Sale Transfer was made on or within 90 days prior to the

Petition Date.

79.    The UCC Transfer or the Sale Transfer enables ACG to receive more than it would if the case were a case under Chapter 7 of the Bankruptcy Code, the UCC Transfer or the Sale Transfer had not been made and ACG received payment of its debts to the extent provided by the provisions of the Bankruptcy Code.

80.    The UCC Transfer or the Sale Transfer improved ACG's position relative to other creditors by i) perfecting a lien on the Debtor's accounts receivable in the 90 days prior to the Petition Date or ii) perfecting any purchase interest it had in the Debtor's accounts receivable in the 90 days prior to the Petition Date.

81.    For these reasons, the UCC Transfer, or the Sale Transfer, is avoidable under Section 547(b).

WHEREFORE, the Debtor requests that this Honorable Court:

    i.    Avoid the UCC Transfer and/or the Sale Transfer as a preferential transfer under Section 547(b);

    ii.    Find that ACG is fully unsecured; and

    iii.    Grant the Debtor any such other relief that is just and proper.

## COUNT FOUR
### (VALIDITY, EXTENT AND PRIORITY OF LIENS – 11 U.S.C. §506)
### [If the Transaction is a Loan or Purchase of Receivables and is Enforceable]

82.    The Debtor incorporates herein the allegations made in paragraphs 1 through 81 of this Complaint.

83.    To the extent that the Court finds that the UCC Transfer is not avoided as a preferential transfer in Count 3, ACG's Claim is still unsecured.

84.    ACG's only collateral is the Debtor's accounts receivable, inventory and

equipment.

85.     The SBA's first priority lien, however,  attaches to the Debtor's accounts receivable inventory and equipment, and its debt exceeds the value of such assets.  There is no equity to which the asserted ACG lien can attach.  As a result, ACG claim is not an allowed secured claim under Section 506(a).

86.     Alternatively, even if the underlying transaction is a purchase of accounts receivable, Section 9-322, 9-109(a)(3) and 1-201(37) make clear that ACG's purchase of future receipts is subject to any existing senior perfected lien.  In this case, SBA holds a first priority lien on the Debtor's accounts receivable and thus is senior to any interest held by ACG.

87.     The asserted lien or purchase interest held by ACG is wholly and fully unsecured and thus voidable in its entirety pursuant to 11 U.S.C. § 506(d).

88.     ACG's claim against the Debtor was not disallowed only under 11 U.S.C. Section 502(b)(5) or 502(e).  ACG's claim is not an allowed secured claim due only to the failure of ACG to file a proof of claim under Section 501.

89.     For all of these reasons, any lien or purchase interest held by ACG is void under Section 506(d).

WHEREFORE, the Debtor respectfully requests that this Honorable Court:

     i.     Determine the validity, extent and priority of the lien asserted by ACG on the Debtor's accounts receivable;

     ii.     Avoid any lien or purchase interest of ACG in the accounts receivable under 11 U.S.C. § 506(d);

     iii.     Determine that any claim held by ACG that is not disallowed is an unsecured claim; and

iv.       grant the Debtor any such other relief that is just and proper.

## COUNT FIVE
### Payment of the Preferential Transfers are Preferences – 11 U.S.C. §547

90.     The Debtor incorporates herein the allegations made in paragraphs 1 through 89 of this Complaint.

91.     The Preferential Transfers constitute transfers of the Debtor's interest in property.

92.     The Preferential Transfers were to or for the benefit of ACG, a creditor of the Debtor.

93.     The Preferential Transfers were paid on account of an antecedent debt owed from the Debtor to ACG before such transfers were made.

94.     The Preferential Transfers were made when the Debtor was insolvent.

95.     The Preferential Transfers were made within 90 days prior to the Petition Date.

96.     If this case were in Chapter 7, the i) Debtor's Assets were subject to the liens of the Debtor's senior secured creditors and no equity existed in such Assets that would be available for payment to unsecured creditors and ii) the Debtor's Unencumbered Assets had a total value of not more than $63,100.00 as of the Petition Date.  The total amount of the Debtor's unsecured claims, including the under secured creditors' claims, was $1,589,103.93 as of the Petition Date.  If the Debtor had not paid the Preferential Transfers to ACG, then ACG would have received only pennies on the dollar in any Chapter 7 bankruptcy case.

97.     The Preferential Transfers enabled ACG to receive more than it would have received if (a) the case was a case under Chapter 7 of the Bankruptcy Code; (b) the Preferential Transfers had not been made; and (c) ACG received only such distribution from the Chapter 7 estate as to which it is entitled under the Bankruptcy Code.

98.     The Preferential Transfers constitute voidable preferences pursuant to 11 U.S.C. § 547.

WHEREFORE the Debtor respectfully requests that this Court:

    i.     avoid the $12,223.84 in Preferential Transfers;

    ii.    award the Debtor prejudgment interest, costs, and legal fees; and

    iii.   grant such other relief as this court deems just and equitable.

### COUNT SIX
### Avoidance of Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(B)
### [If the Transaction is a Loan]

99.     The Debtor incorporates herein the allegations made in paragraphs 1 through 98 of this Complaint.

100.    If the Court finds that the ACG Documents give rise to a loan, is criminally usurious and Void Ab Initio then the Payments are fraudulent transfers under § 548(a)(1)(B) and are avoidable.

101.    The Debtor's Payments to ACG constitute a voluntary transfer of an interest of the Debtor in its property.

102.    All of the Payments were paid within two years before the Petition Date.

103.    The Debtor received less than a reasonably equivalent value in exchange for paying the Payments to ACG.

104.    At the time of the Payments, the Debtor: (i) was insolvent or became insolvent as a result of each of such Payments; and/or (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital.  The Debtor was insolvent because the sum of its debts were greater than its property, at a fair valuation, exclusive of property transferred, concealed, or removed with

intent to hinder, delay, or defraud its creditors.

105.    Pursuant to § 548(a)(1)(B) of the Bankruptcy Code, the transfer of the Payments to ACG constitutes a voidable fraudulent transfer and should be avoided by order of this Court.

106.    Pursuant to § 548(a)(1)(B) of the Bankruptcy Code, the Debtor is entitled to avoid the Payments for the benefit of the Debtor's estate.

**WHEREFORE**, pursuant to § 548(a)(1)(B) of the Bankruptcy Code, the Debtor respectfully requests that this Court:

    i.  Avoid the $42,781.99 in Payments as fraudulent transfers under § 548(a)(1)(B);

    ii.  Award the Debtor, if and as appropriate, its attorneys' fees and the costs of this action; and

    iii.  Grant such other and further relief as is just and equitable.

### COUNT SEVEN

**Avoidance of Fraudulent Conveyance Pursuant to 11 U.S.C. § 544 and MD [Com. Law] Code Ann. §§ 15-204 and/or 15-205**
**[If the Transaction is a Loan]**

107.    The Debtor incorporates herein the allegations made in paragraphs 1 through 106 of this Complaint.

108.    If the Court finds that the ACG Documents give rise to a loan, is criminally usurious and Void Ab Initio then the Payments are fraudulent transfers under 11 U.S.C. § 544 and MD [Com. Law] Code Ann. §§ 15-204 and/or 15-205) and are avoidable.

109.    Pursuant to § 544(b)(1) of the Bankruptcy Code, the Debtor may avoid any transfer of an interest of the Debtor in property or any obligation incurred by the Debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under § 502 or that is not allowable only under § 502(e).

110.    Upon information and belief, at all times relevant to this Complaint, there were

actual creditors of the Debtor with allowable unsecured claims who could avoid the Payments under applicable state law, including but not limited to the Maryland Fraudulent Conveyance Act, MD [Com. Law] Code Ann §§ 15-201, et seq.

111.    Prior to payment of each of the Payments, the Debtor had  ownership of the funds which were later paid by each of the Payments.

112.    Each of the Payments constituted a transfer of an interest of the Debtor in its property.

113.    Pursuant to MD [Com. Law] Code Ann. § 15-204, each of the Payments by the Debtor who was or would be rendered insolvent by them was fraudulent as to creditors since each such conveyance was made without fair consideration to the Debtor.

114.    For purposes of MD [Com. Law] Code Ann. § 15-204, the Debtor was insolvent because the then present fair market value of its assets was less than the amount required to pay its probable liability on its then existing debts as they became absolute and matured.

115.    Pursuant to MD [Com. Law] Code Ann. § 15-205, the Payments by the Debtor were made without fair consideration at a time when the Debtor was engaged or was about to engage in a business or transaction for which property remaining in the Debtor's possession after each such Payment was an unreasonably small capital and was fraudulent to creditors and other persons who became creditors during the continuance of the business or transaction.

116.    For purposes of MD [Com. Law] Code Ann. §§ 15-204 and 15-205, upon information and belief, in exchange for each of the Payments, ACG did not provide fair consideration to the Debtor.

117.    Accordingly, in exchange for the Payments, ACG did not, in good faith and as a fair equivalent for each, provide the Debtor property or satisfy an antecedent debt owed by the

Debtor.

118.     The Payments constitute voidable fraudulent conveyances and should be avoided by order of this Court under §§544(b)(1) of the Bankruptcy Code and the Maryland Fraudulent Conveyance Act §§ 15-204 and/or 15-205.

**WHEREFORE**, pursuant to § 544(b)(1) of the Bankruptcy Code and the MD [Com. Law] Code Ann. §§ 15-201 through 15-214, the Debtor respectfully requests that this Court:

i.   Avoid the $42,781.99 in Payments as fraudulent conveyances under §544(b)(1) and MD [Com. Law] Code §§ 15-204 and/or 15-205;

ii.  Enter a levy on and/or garnish all assets conveyed by the Debtor to the extent of the total amount of the Payments;

iii. Award the Debtor, if and as appropriate, its attorneys' fees and the costs of this action; and

iv.  Grant such other and further relief as is just and equitable.

## COUNT EIGHT

### Avoidance of Fraudulent Conveyance Pursuant to 11 U.S.C. § 544 and MD [Com. Law] Code Ann. §15-208(b) [If the Transaction is a Loan]

119.     The Debtor incorporates herein the allegations made in paragraphs 1 through 118 of this Complaint.

120.     If the Court finds that the ACG Documents give rise to a loan, is criminally usurious and Void Ab Initio then the Payments are fraudulent transfers under 11 U.S.C. § 544 and MD [Com. Law] Code Ann. §§ 15-208 and are avoidable.

121.     Pursuant to § 544(b)(1) of the Bankruptcy Code, the Debtor may avoid any transfer of an interest of the Debtor in property or any obligation incurred by the Debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under § 502 or that

6306162.2

is not allowable only under § 502(e).

122.    Upon information and belief, at all times relevant to this Complaint, there were actual creditors of the Debtor with allowable unsecured claims who could avoid the Payments under applicable state law, including but not limited to the Maryland Fraudulent Conveyance Act, MD [Com. Law] Code Ann §§ 15-201, et seq.

123.    Prior to payment of each of the Payments, the Debtor had full ownership of the funds which were later paid by each of such Payments.

124.    Each of the Payments constituted a transfer of an interest of the Debtor in its property.

125.    Pursuant to MD [Com. Law] Code Ann. § 15-208(b), each of the Payments was purportedly incurred by the Debtor at a time when it was or would be rendered insolvent by it, and is fraudulent as to creditors of the Debtor since each of the Payments was made to ACG, a person who was not a member of the Debtor and without fair consideration to the Debtor as distinguished from consideration to the individual members.

126.    The Debtor was insolvent at these times because the present fair market value of its assets was less than the amount required to pay its probable liability on its existing debts as they became absolute and matured.

127.    Any value given by ACG in exchange for the Payments had the direct effect of depleting the Debtor's available cash and ensuring that debt owed by the Debtor to its creditors remained unpaid.

128.    Each of the Payments constitutes a voidable fraudulent conveyance and should be avoided by order of this Court under §§544(b)(1) of the Bankruptcy Code and the Maryland Fraudulent Conveyance Act §15-208.

**WHEREFORE**, pursuant to § 544(b)(1) of the Bankruptcy Code and the MD [Com. Law] Code Ann. §§ 15-201 through 15-214, the Debtor respectfully requests that this Court:

    i.        Avoid the $42,781.99 in Payments as fraudulent conveyances under § 544(b)(1) and MD [Com. Law] Code §§ 15-208;

    ii.      Enter a levy on and/or garnish all assets conveyed by the Debtor;

    iii.     Award the Debtor, if and as appropriate, its attorneys' fees and the costs of this action; and

    iv.     Grant such other and further relief as is just and equitable.

## <u>COUNT NINE</u>
### <u>Recovery of the Value of the Transfers Pursuant to 11 U.S.C. § 550</u>

129.    The Debtor incorporates herein the allegations made in paragraphs 1 through 128 of this Complaint.

130.    To the extent that ACG is required to hold the Payments or the value of the Payments in trust pursuant to Count 2, then the Debtor is entitled to recover the value of the Payments under § 550.

131.    Pursuant to 11 U.S.C. § 547(b) as provided in Count 5, the Debtor is entitled to avoid the Preferential Transfers.

132.    To the extent that the Court finds the transaction is a loan, is usurious and void, then pursuant to (i) 11 U.S.C. § 548(a)(1)(B) as provided in Count 6 and/or (ii) 11 U.S.C. § 544(b)(1) and MD [Com. Law] Code Ann. §§ 15-201 through 15-214 as provided in Counts 7 and 8, the Debtor is entitled to avoid the Payments.

133.    Pursuant to 11 U.S.C. § 550(a), the Debtor is entitled to recover the value of the property transferred under §§ 544, 547 and 548 from:

    i.       the initial transferee of each a) of the Preferential Transfers, and b) of the Payments; or

    ii.      the entity for whose benefit a) each of such Preferential Transfers and b) each of the Payments were made or any immediate or mediate transferee of such initial transferee.

134.    Upon information and belief, ACG was:

    i.       the initial transferee of a) each of the Preferential Transfers and b) each of the Payments or the entity for whose benefit they were made; and/or

    ii.      the immediate or mediate transferee of such initial transferee within the meaning of § 550(a) of the Bankruptcy Code.

135.    Pursuant to 11 U.S.C. § 550(a), the Debtor is entitled to recover from ACG: i) the total amount of the Preferential Transfers avoided in Count 5; ii) the total amount of the Payments avoided in Counts 6, 7 and 8; and iii) its attorneys' fees and interest.

WHEREFORE, pursuant to 11 U.S.C. §§ 550(a) and 547(b), 548(a)(1)(B), and/or 544(b)(1) and MD [Com. Law] Code Ann. §§ 15-201 through 15-214, the Debtor respectfully requests that this Court:

    a.      Enter a judgment in favor of the Debtor and against ACG in an amount not less than the $12,223.84 in Preferential Transfers;

    b.      Enter a judgment in favor of the Debtor and against ACG in an amount not less than the $42,781.99 Payments;

    c.      Award the Debtor interest and its attorney's fees together with any costs of this action; and

    d.      Grant such other relief as is just and equitable.

## COUNT TEN
### Turnover of Property of the Estate - 11 U.S.C. § 542

136.     The Debtor incorporates herein the allegations made in paragraphs 1 through 135 of this Complaint.

137.     To the extent this Court enters a money judgment in favor of the Debtor and against ACG pursuant to Count 9 of this Complaint, then ACG owes this bankruptcy estate money equal to the amount of such judgment, plus any accruing interest and costs.

138.     Pursuant to § 542, the Debtor is entitled to the turnover of the amount of the money judgment entered by this Court as part of Count 9 of this Complaint, plus any accrued interest, attorneys' fees, and costs.

WHEREFORE, the Debtor respectfully requests that this Court:

a.     Order ACG to turnover to the Debtor, within 30 days, a total sum equal to the amount of such money judgment or judgments entered by the Court, plus any accrued interest and costs; and

b.     Grant such other relief as is just and equitable.

## COUNT ELEVEN
### Disallowance of Claims - 11 U.S.C. § 502(d)

139.     The Debtor incorporates herein the allegations made in paragraphs 1 through 138 of this Complaint.

140.      To the extent that this Court enters a judgment against ACG under Count 9 of this Complaint, then ACG is an entity from which property is recoverable.

141.     To the extent ACG does not pay or turn over the money adjudged by this Court to be owed to the Debtor on account of Count 9, then pursuant to § 502(d), the Proof of Claim must be disallowed until such time ACG pays such sums to the Debtor plus interest and costs.

WHEREFORE, the Debtor requests that the Court enter an Order:

a.    Disallowing pursuant to § 502 the Proof of Claim unless and until ACG pays to the Debtor any amount adjudged by this Court to be owed to the Debtor under the Complaint including Count 9; and

b.    Granting such other and further relief as is just appropriate.

## COUNT TWELVE
### Disallowance of Claim - 11 U.S.C. § 502(b)(1)

142.    The Debtor incorporates herein the allegations made in paragraphs 1 through 141 of this Complaint.

143.    ACG's Proof of Claims asserts that its claim is secured in the amount of $44,818.01. To the extent that this Court finds that ACG's claim is not secured in Counts 2, 3, and/or 4, then ACG's claim should be disallowed as a secured claim.

144.    To the extent that this Court finds that ACG is not secured by the Debtor's assets and holds only an unsecured claim, then ACG is not entitled to any interest, fees, or expenses and that portion of its claim must be disallowed.

145.    ACG fails to attach any documents to its Proof of Claim and as a result it is impossible to tell if the amount specified in the Proof of Claim is accurate.  Upon information and belief, ACG's claim is erroneous, and the entire claim should be disallowed under Section 502.

WHEREFORE, the Debtor requests that the Court enter an Order:

a.    Disallowing ACG's Proof of Claim pursuant to §§ 502 and 506 as a secured claim;

6306162.2

    b.      Disallowing the full amount of ACG's claim until it provides a breakdown of its claim and demonstrates to this Court that all amounts are, in fact, owed within the parameters of the ACG Documents and §§ 502 and 506; and

    c.      Granting such other and further relief as is just appropriate.

Date: October 10, 2025

Respectfully submitted,

/s/ *Mary Fran Ebersole*
Mary Fran Ebersole, Bar No. 08729
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, Maryland 21202
mebersole@tydings.com
Telephone (410) 752-9700
*Counsel for the Debtor*